**MORGAN, LEWIS & BOCKIUS LLP**
**(A Pennsylvania Limited Liability Partnership)**
**502 Carnegie Center**
**Princeton, New Jersey 08540**
**609-919-6600**
**Rene M. Johnson**
**Jaime N. Morris**
**Attorneys for Defendant Parsons Inspection and**
**Maintenance Corporation**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANN MARIE ANCHETA, KAROLYNE PRATTS AND ORNELL CARNEY,** jointly, severally and in the alternative,<br><br>   **Plaintiffs,**<br><br>   **v.**<br><br>**PARSONS, SONYAE A. TURNER, DAVID DUFFY, GREGG NATOSI, SCOTT GANDY, WARREN DUNLAP, BRIAN BUDDY AND JOHN DOE AGENTS, SERVANTS AND EMPLOYEES OF PARSONS RESPONSIBLE FOR THE HOSTILE WORK ENVIRONMENT, HARASSMENT AND RETALIATION (PLURAL 1-10)** jointly, severally and in the alternative,<br><br>   **Defendants.** | **Civil Action No. _____**<br><br><br><br>**NOTICE OF REMOVAL**<br><br><br>**Document Electronically Filed** |

TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

PLEASE TAKE NOTICE that Defendant Parsons Inspection and Maintenance Corporation ("Parsons")[1], with the consent of Defendants Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, and Brian Buddy, by its undersigned counsel, and pursuant

---

[1]   Defendants assume that the "Parsons" named in the Complaint by Plaintiffs is Parsons Inspection and Maintenance Corporation, as that entity is Plaintiffs' employer.

to 28 U.S.C. §§ 1441 and 1446 hereby files this Notice of Removal of this Civil Action from the Superior Court of New Jersey, Law Division, Atlantic County, to the United States District Court for the District of New Jersey. In support of its Notice of Removal, Defendant Parsons states as follows:

1.      On or about December 19, 2008, Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney ("Plaintiffs") filed an action against Defendants in the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. ATL-L-004526-08, which case is still pending. A copy of the Complaint is attached hereto as Exhibit A.

2.      A copy of the Complaint was served upon Defendant Parsons by hand delivery on January 8, 2009.

3.      Based on the foregoing, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) because thirty (30) days have not elapsed since the Complaint was received by Defendant Parsons.

4.      No other proceedings have been held in the Superior Court of New Jersey, and the Complaint attached hereto as Exhibit A constitutes all of the filed pleadings in this case.

5.      In the State Court action, Plaintiffs in the Complaint alleged claims against Defendant Parsons for unlawful discrimination, hostile work environment harassment, wrongful discharge, and retaliation under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq.

6.      Although not expressly enumerated as separate causes of action, the Complaint also contains claims arising under federal law. The Third Circuit has cautioned that a "court [should] not allow a plaintiff to deny a defendant a federal forum when the plaintiff's complaint contains a federal claim 'artfully pled' as a state law claim." Goepel v. Nat'l Postal Mail Handlers Union, 36 F.3d 306, 311 n. 5 (3d Cir. 1994) (citation omitted). In the present case, in

Count One of the Complaint Plaintiffs seek damages for their claim that they were harassed, discriminated against and retaliated against for allegedly engaging in union activity (which necessarily implicates the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq.) and for taking leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. In that regard, Plaintiffs in Count One, Paragraph 4 of the Complaint state that:

> "In June 2007, Plaintiff Ancheta went out on disability leave under the Federal [*sic*] Medical Leave Act. Plaintiff exceeded her FMLA disability leave period by three days. Approximately one month after Ms. Ancheta returned from leave, she created, promoted and signed a Union petition involving vacation issues. The employees had requested her to do so and in her role as Shop Steward, this was her duty. Approximately one week after this petition was created, she was formally disciplined and put on a three day suspension for her absence that went over the 12 week statutorily prescribed time period for her FMLA leave. In this regard Plaintiff was retaliated against for acting as the Shop Steward by letting employees know of their rights and producing petitions and influencing others to file Union Grievances against Parsons of Mays Landing. Plaintiffs Ancheta and Pratts were made virtual pariahs at Parsons following Ms. Ancheta's return to work from her shoulder-related disability. Ann Marie Ancheta actually was forced to pursue psychological therapy and the hostile work environment created mental anguish that resulted in her taking time off within December, 2007 and January, 2008."

7.     Because Plaintiffs have sought damages for harassment, discrimination and retaliation under the NLRA and FMLA they are clearly seeking relief under federal law. Accordingly, this Court has federal question jurisdiction of these claims pursuant to 28 U.S.C. § 1331.

8.     In addition, the allegations set forth in Counts One through Five of the Complaint for relief under the NJLAD are integrally related to those advanced under federal law in the Complaint. Accordingly, this Court possesses supplemental jurisdiction over Plaintiffs' NJLAD claim pursuant to 28 U.S.C. § 1367(a).

9.     Defendant Parsons seeks removal of this action pursuant to 28 U.S.C. § 1441(b) on the ground that the above-captioned matter is a civil action over which this Court possesses

federal question jurisdiction under 28 U.S.C. § 1331 and, alternatively, supplemental jurisdiction under 28 U.S.C. § 1367(a).

10.     The United States District Court for the District of New Jersey is the judicial district embracing the place where the state court action was brought and is pending, and therefore is the proper district court to which this case should be removed.

11.     By this Notice of Removal, Defendant Parsons is not waiving, and expressly reserves, its right to contest personal jurisdiction, service and the sufficiency of the Complaint.

12.     Pursuant to 28 U.S.C. § 1446(d), written notice of the filing of this Notice of Removal will be given to Plaintiffs, and a copy of the Notice of Removal will be filed with the Clerk of the Superior Court of New Jersey, Law Division, Atlantic County.

13.     The undersigned is counsel for Defendant Parsons and is duly authorized to effect removal on its behalf.

WHEREFORE, Defendant Parsons, with the consent of all other named Defendants in this action, respectfully requests that this action be removed from the Superior Court of New Jersey, Law Division, Atlantic County, and that this Court take jurisdiction over further proceedings.

Respectfully submitted,

Dated:  February 6, 2009

s/ Rene M. Johnson
Rene M. Johnson, Esq.
Jaime N. Morris, Esq.
MORGAN LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, NJ 08540
T: 609.919.6600
F: 609.919.6701
*Attorneys for Defendant Parsons Inspection and Maintenance Corporation*

# **EXHIBIT A**

*PRESS & TAGLIALATELLA, L.L.C.*
*By: Richard L. Press, Esquire*
23 East Black Horse Pike
Pleasantville, New Jersey 08232
(609) 641-2900
Attorneys for Plaintiff
Our File No.: 08-042

RECEIVED and
FILED

DEC 2 3 2008

ATLANTIC COUNTY
LAW DIVISION

|  |  |  |
|---|---|---|
| Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, | : | SUPERIOR COURT OF NEW JERSEY ATLANTIC COUNTY LAW DIVISION |
| Plaintiffs, | : | NJLAD et al |
| v. | : | DOCKET NO: ATL-L- 4 5 1 6 -08 |
| Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy, and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative | : : : : : : | Civil Action

*COMPLAINT & JURY DEMAND* |
| Defendants. | : |  |

Plaintiffs Ann Marie Ancheta residing at 6656 Black Horse Pike, Lot 612, Egg Harbor Township, New Jersey 08234; Karolyne Pratts residing at 717 Pine View Avenue, Egg Harbor Township, New Jersey 08234; and Ornell Carney residing at 314 10th Street, Newtonville, New Jersey 08346, by way of this Complaint as against the Defendants states as follows:

<u>COUNT ONE</u>

1.   Starting on or about May, 2007, Plaintiffs Ann Marie Ancheta and Karolyne Pratts experienced discrimination and harassment based on their sexual orientation. Both Ms. Ancheta and Ms. Pratts are homosexual partners.

2.   Ms. Ancheta was the Shop Steward at the Mays Landing Parsons facility during 2007 until her termination date on February 15, 2008.

3.   In May, 2007 a red condom was placed in Karolyne Pratts' mailbox at the Mays Landing inspection facility. Ms. Pratts was then verbally accosted as to her complaining about the act of placing the condom in her mailbox by Brian Buddy, a superior, who confronted Ms. Pratts about the incident in front of customers. The condom was placed in Ms. Pratts' mailbox after employees at the Parsons' Mays Landing inspection facility learned of the relationship between Ms. Pratts and Ms. Ancheta. Since that time period, the unfettered behaviors of employees and supervisors towards Plaintiffs created a work environment of hostility. Since May, 2007, both Plaintiffs Ann Marie Ancheta and Karolyne Pratts have been referred to as "bitch", "carpet muncher" and other vulgarities. Another example is the multiple incidents where Plaintiffs were subjected to another employee showing them his breasts and buttocks. Even more repulsive, a Parsons employee said in front of other employees, "How about I spread my cheeks open and put cheese in there for you to eat," directly to Plaintiff Karolyne Pratts. Their personal relationship subjected to a hostile work environment where their sexual orientations were the subject and ridicule of both employees and superiors at the Parons inspection station in Mays Landing. The harassment based on Plaintiffs Ancheta and Pratts' sexual orientation went on unfettered in the plain view of Station Manger Warren Dunlap. Although the incidents have been ongoing prior to 2007, in May and June, 2007, Plaintiffs reported the conduct they were experiencing to Defendant Warren Dunlap. The conduct continues to the present.

2

4.   In June, 2007, Plaintiff Ancheta went out on disability leave under the Federal Medical Leave Act.   Plaintiff exceeded her allotted FMLA disability leave period by three days. Approximately one month after Ms. Ancheta returned from leave, she created, promoted and signed a Union petition involving vacation issues. The employees had requested her to do so and in her role as Shop Steward, this was her duty. Approximately one week after this petition was created, she was formally disciplined and put on a three day suspension for her absence that went over the 12 week statutorily prescribed time period for her FMLA leave. In this regard Plaintiff was retaliated against for acting as the Shop Steward by letting employees know of their rights and producing petitions and influencing others to file Union grievances against Parsons of Mays Landing. Plaintiffs Ancheta and Pratts were made virtual pariahs at Parsons following Ms. Ancheta's return to work from her shoulder-related disability. Ann Marie Ancheta actually was forced to pursue psychological therapy and the hostile work environment created mental anguish that resulted in her taking time off within December, 2007 and January, 2008. On many occasions, Plaintiffs' superior David Duffy made the statement to Karolyne Pratts, "where's Ann Marie, don't you sleep with her?" in front of employees and customers.   The ridicule regarding Plaintiffs' sexual orientation persisted until Ann Marie Ancheta filed Union grievances on January 31, 2008 against Scott Gandy and David Duffy based on the harassment and discrimination they were experiencing and against the Management for simply doing nothing about it and letting it remain unfettered.

5.   Plaintiff Ornell Carney, Plaintiffs' Team Leader, made statements to the Management Personnel of Parsons as well as Human Resources of substantiating the harassment and the lack of action by the Management.

3

6    On February 6, 2008, all three said Plaintiffs as well as Ann Marie Ancheta's brother Jonathan Ancheta called out of work for various reasons based on illnesses and other necessities to be absent from work. Plaintiffs were internally investigated and Plaintiffs Ancheta and Carney were summarily terminated on February 15, 2008. Following the investigation, Plaintiff Pratt retained her position but was subjected to ongoing harassment based on her sexual orientation. Also to ensure Plaintiffs would not be brought back, Defendants David Duffy and Warren Dunlap had employees of Parsons of Mays Landing write statements against the three Plaintiffs stating that they caused a hostile work environment, defaming them and leading to more hostility towards the Plaintiffs. Defendant Warren Dunlap has known about the problems between Plaintiffs and Defendant Scott Gandy and David Duffy, but did nothing to resolve or remedy the situation. Plaintiff Carney was simply punished for taking sides with the victims of sexual orientation discrimination Ann Marie Ancheta and Karolyne Pratts. On many occasions throughout 2007 and into 2008, Mr. Carney was a witness to statements made about Ms. Ancheta and Ms. Pratts in the presence of Defendant Dunlap who would simply just grin. Plaintiffs were subjected to a hostile work environment, discrimination based on sexual orientation and harassment based on sexual orientation from April, 2007 until the present date. Management-level employees at Parsons not only contributed to the said acts, but also willfully allowed them to continue until the present date. Plaintiffs exhausted their Union remedies and were successful at Arbitration.

7.   On November 21, 2008, Arbitrator Restaino issued a remedy that partially reimburses each of the Plaintiffs as outlined in Arbitrator Restaino's Award which is attached hereto and incorporated herein as **Pl. Ex. A.** As a result of the conduct of Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap and  Brian Buddy as set forth

4

above and as set forth in Arbitrator Restaino's Decision, this First Count is brought for a hostile work environment by Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, as against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for a hostile work environment created by the Defendants for each Plaintiff from April, 2007 through to the current date.

**WHEREFORE,** Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, bring this Count against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for a hostile work environment in violation of the New Jersey Law Against Discrimination and Plaintiffs seek all compensatory damages, punitive damages, counsel fees and costs and all other damages as permitted by the New Jersey Law Against Discrimination and related regulations and such other relief as the Court or jury may deem just and appropriate.

**COUNT TWO**

1. Plaintiffs repeat the allegations contained in the preceding Count One and make them paragraph 1 of this Count Two as though the same were fully set forth at length herein.

2. This Count is brought as against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation

5

(Plural 1-10), jointly, severally and in the alternative, by Plaintiffs Ann Marie Ancheta, Kaolyne Pratts and Ornell Carney, jointly, severally and in the alternative, for retaliation against each Plaintiff by the Defendants pursuant to *N.J.S.A.* *10:5-5(q)* and its related administrative regulations. Specifically each of the Plaintiffs were subjected to retaliatory conduct by Defendants and Defendants' employees whenever they brought up the issue of a hostile work environment to Human Resources, their Union, or to supervisors. For example, Supervisor Ornell Carney was subjected to unwarranted discrimination and ultimately terminated as a result of supporting Plaintiffs Ancheta and Pratts' claims of a hostile work environment. Each Plaintiff claims unwarranted disciplines, failure of Parsons to correct the hostile work environment, belittling comments made to them by co-workers and supervisors and ultimately wrongful termination.

3.     As a result of the conduct of Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, as set forth above and as set forth in Arbitrator Restaino's Decision, this Second Count is brought for retaliation experienced by Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, as against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for retaliation beginning in May, 2007 through to the current date.

6

4. This Count is brought pursuant to the NJLAD and its prohibition against retaliation not only for raising the issues that are set forth above, but in Mr. Carney's case supporting Plaintiffs' positions as to their claims of hostile work environment, discrimination and breach of their rights under the NJLAD and its administrative regulations.

**WHEREFORE,** Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, bring this Count against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for retaliation in violation of *N.J.S.A. 10:5-5(q)* and Plaintiffs seek all compensatory damages, punitive damages, counsel fees and costs and all other damages as permitted by the New Jersey Law Against Discrimination and related regulations and such other relief as the Court or jury may deem just and appropriate.

### COUNT THREE

1. Plaintiffs repeat the allegations contained in the preceding Counts and make them paragraph 1 of this Count Three as though the same were fully set forth at length herein.

2. This Count is brought as against Defendant Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for failing and continuing to fail to take prompt, effective remedial action in correcting derogatory sexual comments made to Plaintiffs Ancheta and Pratts which they reported to Human Resources and to upper level supervisors and no action was taken. Plaintiffs were following the employee handbooks and guidelines for reporting the

7

hostile work environment, but Parsons and its Human Resources Director Sonyae A. Turner and supervisors at the Mays Landing inspection station did nothing pursuant to their own written guidelines.

3.   As a result of failing to take prompt, effective, remedial action to stop the behaviors of various employees at the inspection station Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, as set forth above and as set forth in Arbitrator Restaino's Decision, this Count is brought for a hostile work environment that was allowed to go on unfettered in violation of the New Jersey Law Against Discrimination as well as gross negligence, intentional misconduct by Parsons, its Human Resources Director and supervisors to take prompt, effective, remedial action.

4.   The Defendants in this action, jointly, severally and in the alternative, not only failed to take corrective action but further antagonized the situation by literally laughing and taking very lightly the Plaintiffs' complaints, particularly in a situation such as this where Plaintiffs are now required to work in an environment where supervisors not only continue to permit this illegal conduct, but also encourage it.

**WHEREFORE,** Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, bring this Count against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and

8

Retaliation (Plural 1-10), jointly, severally and in the alternative, for Defendants' collective failure to take any remedial action and by even participating in certain circumstances with the conduct directed towards the Plaintiffs. Plaintiffs seek all compensatory damages, punitive damages, counsel fees and costs and all other damages as permitted by the New Jersey Law Against Discrimination and related regulations and such other relief as the Court or jury may deem just and appropriate.

### COUNT FOUR

1. Plaintiffs repeat the allegations contained in the preceding Counts and make them paragraph 1 of this Count Four as though the same were fully set forth at length herein.

2. Plaintiffs Ann Marie Ancheta and Karolyne Pratts bring this Count against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for violation of *N.J.S.A* 10.5-1. *et seq.* for comments made directed to them, some of which were directly in front of supervisors who laughed at it, and some of which were in front of Supervisor Ornell Carney who attempted to stop it and was therefore retaliated against.

3. As a result of the discrimination based on gender and sexual orientation as set forth above and as set forth in Arbitrator Restaino's Decision, this Count is brought for violations of the New Jersey Law Against Discrimination based on gender and sexual orientation against Plaintiffs Ann Marie Ancheta and Karolyne Pratts as against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation

(Plural 1-10), jointly, severally and in the alternative, and the *per se* violation of the employees' duty to take prompt, effective and investigation and elimination of the allegations supplied to them by Plaintiffs.

**WHEREFORE,** Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, bring this Count against Defendants Parsons, Sonyae A. Turner, David Duffy, Gregg Natosi, Scott Gandy, Warren Dunlap, Brian Buddy and John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10), jointly, severally and in the alternative, for Defendants' collective failure to take any remedial action and by even participating in certain circumstances with the conduct directed towards the Plaintiffs. Plaintiffs seek all compensatory damages, punitive damages, counsel fees and costs and all other damages as permitted by the New Jersey Law Against Discrimination and related regulations and such other relief as the Court or jury may deem just and appropriate.

## COUNT FIVE

1. Plaintiffs repeat the allegations contained in the preceding Counts and make them paragraph 1 of this Count Five as though the same were fully set forth at length herein.

2. Defendants on this Count, John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and Retaliation (Plural 1-10) are unknown at the present time. Discovery should reveal these individuals and Plaintiffs reserve their rights, pursuant to the John Doe Rule, to amend their Complaint.

**WHEREFORE,** Plaintiffs Ann Marie Ancheta, Karolyne Pratts and Ornell Carney, jointly, severally and in the alternative, bring this Count as against Defendants John Doe Agents, Servants and Employees of Parsons Responsible for the Hostile Work Environment, Harassment and

10

Retaliation (Plural 1-10), jointly, severally and in the alternative, for Defendants' collective failure to take any remedial action and by even participating in certain circumstances with the conduct directed towards the Plaintiffs. Plaintiffs seek all compensatory damages, punitive damages, counsel fees and costs and all other damages as permitted by the New Jersey Law Against Discrimination and related regulations and such other relief as the Court or jury may deem just and appropriate.

PRESS & TAGLIALATELLA, LLC

Daniel M. Kurkowski, Esquire
Attorneys for Plaintiffs

Dated: December 19, 2008

## DEMAND FOR JURY TRIAL

Demand is hereby made for a Trial by jury on all issues contained herein.

## NOTICE OF TRIAL COUNSEL

PLEASE TAKE NOTICE that, pursuant to *Rule 4:25-4*, Daniel M. Kurkowski, Esquire is hereby designated as Trial counsel in the above captioned matter on behalf of the Law Firm of PRESS & TAGLIALATELLA, Attorneys for Plaintiffs.

PRESS & TAGLIALATELLA, LLC

Daniel M. Kurkowski, Esquire
Attorneys for Plaintiffs

Dated: December 19, 2008

11

## CERTIFICATION

I hereby certify that there are no other actions to my knowledge pending in any Court concerning the subject matter of the Complaint contained herein. I further certify that there are no other parties to my knowledge who should be joined in this action at this time.

Nothing contained in this Complaint shall be construed or deemed to be an admission, of any kind, against Plaintiff. This is not a Verified Complaint and is a document prepared by counsel.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

PRESS & TAGLIALATELLA, LLC

_____
Daniel M. Kurkowski, Esquire
Attorneys for Plaintiffs

Dated: December 19, 2008

12

**EXHIBIT A**

# NEW JERSEY STATE BOARD OF MEDIATION

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

In the Matter of the Arbitration Between   )
)
)

PARSONS INSPECTION AND
MAINTENANCE CORPORATION   )
)                     **OPINION**
**EMPLOYER**   )
)                     **AND**
AND   )
)                     **AWARD**
SEIU LOCAL 518,   )
)
**UNION**   )
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx)

CASE NO.            08-0292

ARBITRATOR:        GERARD G. RESTAINO, MUTUALLY CHOSEN BY THE
                   PARTIES PURSUANT TO THE PROCEDURES
                   OF THE NEW JERSEY STATE BOARD OF MEDIATION

APPEARANCES:

      FOR THE EMPLOYER
      SONYAE TURNER              DIRECTOR OF HR
      GREGG NATOSI               REGIONAL MANAGER
      WARREN DUNLOP              MANAGER, MAYS LANDING FACILITY
      TODD WHITTEN               WITNESS/EMPLOYEE
      BRUCE IANNELLO             WITNESS/EMPLOYEE
      ELISEO VILLALONGO          WITNESS/EMPLOYEE


      FOR THE UNION
      CURTISS JAMESON, ESQ.      COUNSEL FOR UNION
      ORNELL CARNEY              GRIEVANT
      JONATHAN SABADO ANCHETA    GRIEVANT
      ANN MARIE ANCHETA          GRIEVANT
      KAROLYNE PRATTS            WITNESS/EMPLOYEE
      JOSEPH FELS                EXECUTIVE BOARD MEMBER OF UNION

## PROCEDURAL BACKGROUND

The parties in this dispute are signatories to a collective bargaining agreement which was not introduced into evidence but specific excerpts were.

The grievance filed by SEIU Local 518, hereinafter referred to as the Union, on behalf of Ann Ancheta, Jonathan Sabado, Ancheta and Ornell Carney, hereinafter referred to as the grievants/Ms. Ancheta, Mr. Ancheta and Mr. Carney, alleges that Parsons, hereinafter referred to as the Employer/Company, terminated the grievants in violation of the Agreement.

The grievance was timely processed through the grievance procedure, and a request was made to the New Jersey State Board of Mediation (NJSBM) to submit a panel of arbitrators.  On August 20, 2008, the undersigned was appointed arbitrator.

A hearing was held on October 21, 2008, at the offices of the NJSBM.  At the hearing, each party had a full and complete opportunity to present evidence and testimony on their behalf, to examine and cross-examine witnesses under oath and to argue their respective positions.  Capable, competent individuals represented each party and both parties provided oral closing summations.  The hearing was officially closed on October 21, 2008.

**ISSUE**

The parties stipulated to the following issue:

*Did the Employer have just cause to terminate Ann Ancheta and Jonathan Ancheta for creating a work stoppage and Ornell Carney for lewd conduct and creating a work stoppage?  If not, what shall be the remedy?*

1

**RELEVANT CONTRACTUAL PROVISIONS**

*ARTICLE XII – NO STRIKE OR LOCKOUT*

*1. No employee shall engage in any strike, picketing, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer for the duration of this agreement.*

*2. The Union, its officers, agents, representatives and members, shall not in any way, directly or indirectly, authorize, assist, encourage, participate or sanction any strike, picketing, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott or other interference with the operations of the Employer, or ratify, condone or lend support to any such conduct or action.*

*3. The prohibitions of this Article are intended to apply regardless of the motivation for the strike or other conduct. By way of illustration only, this Article expressly prohibits (1) sympathy strikes (individual or concerted failure to cross a picket line established by another labor organization or by members of another bargaining unit); (2) strikes over disputes that are not subject to arbitration; and (3) strikes in protest of alleged violations of state or federal law. Except as expressly provided in this Agreement, any statutory right that Employees may otherwise have under the National Labor Relations Act to engage in such conduct is hereby expressly waived by the Union.*

*4. In addition to any other liability, remedy or right provided by applicable law or statute, should a strike, picketing, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer occur, the Union, within twenty four (24) hours of a request by the Employer, shall:*

    *(a)    Publicly disavow such action by the Employees.*

    *(b)    Advise the Employer in writing that such actions by Employees has not been called or sanctioned by the Union.*

    *(c)    Notify Employees of its disapproval of such action and instruct such Employees to cease such action and return to work immediately.*

    *(d)    Post notices at Union Bulletin Boards advising that it disapproves such action, and instructing Employees to return to work immediately.*

    *(e)    After delivery of the above statement to the Company, the Union will take no action, which in any way undermines it.*

2

5. *Any Employee who participates in any activity prohibited by this Article shall be subject to discharge or such lesser discipline, as the Company in its discretion shall determine.  The Employee shall have recourse to the grievance and arbitration procedure only as to the question of whether he or she in fact participated in such prohibited activity.*

6. *The Company shall be entitled to all appropriate judicial remedies, including but not limited to injunctive relief if a violation of this Article should occur.  In lieu of or in addition to any such action for injunctive relief or damages, the Company may also seek relief under the grievance and arbitration procedure.*

## ARTICLE XXV – PERSONAL LEAVE

1. *Personal leave may be used for emergencies or personal reasons.*

2. *Employees shall be entitled to five (5) days of paid personal leave during each calendar year.*

3. *Employees hired during the calendar year shall be entitled to one-half (1/2) day of personal leave for each month of service, up to a maximum of five (5) days for the remainder of that calendar year.*

4.        (a)  *Except for emergencies, Employees shall request personal leave days three (3) days in advance.  The Employer reserves the right to deny such request based upon  business demands, but such requests shall not be unreasonably denied.*

          (b)  *Personal leave request conflicts shall be resolved on the basis of seniority.  Personal  leave may be scheduled in units of one-half (1/2) day, one (1) day or more than one (1) day.*

          (c)  *Employees who have used all of their sick leave may use up to five (5) personal days as additional sick leave.  However, at the manager's discretion, a medical or health care provider may be required to substantiate each absence, unless otherwise prohibited by law.*

## ARTICLE XXXVII – SICK LEAVE

1. *Sick leave may be utilized by Employees when they are unable to perform their work due to illness or injury.  Sick leave may also be used for short periods because of a death in the Employee's immediate family or in order to tend to a member of the Employee's immediate family who is seriously ill.*

2. *Employees shall be entitled to ten (10) days of sick leave each calendar year. Sick leave is credited at the beginning of the calendar year in anticipation of continued employment for the full year.  Employees hired during a calendar year*

3

shall be credited one (1) day of sick leave for each month of service, up to a maximum of ten (10) days for the remainder of that calendar year. Unused sick leave shall accrue from calendar year to calendar year.

3. In all cases of illness, whether of short or long duration, the Employee is required to notify the Employer at the earliest possible time, but in no event later than thirty (30) minutes prior to Employee's reporting time for work. If the duration of absence is three (3) working days or more, the Employee must provide a written and signed statement by Employee's health care provider justifying the entire absence and the Employee must report to Employer as to his/her continued absence on every third (3rd) day thereafter, unless other arrangements are made by the Employer. An Employee's failure to report absences in accordance with this section or an Employee's abuse of sick leave privileges may be cause for disciplinary action.

4. If an Employee knows that he/she will require sick leave for more than ten (10) days, the Employee must request such leave in writing to his immediate manager. This request must be accompanied by a written and signed statement by a health care provider, which includes the anticipated duration of the Employee's incapacity.

5. Employees may apply for use of sick leave for periods of less than a full work day for appropriate reasons, including but not limited to the following: (1) onset of illness while working; (2) tending to a member of his/her immediate family who is seriously ill; or (3) for a medical appointment which could not be arranged during non-work time. The Employee must charge such sick leave time against his accumulated sick leave balance, or, if such Employee has no sick leave balance, against personal leave, or, alternatively, the Employee may take leave without pay. Utilization of any sick leave for less than a full workday shall be on an hourly basis; one (1) hour of sick leave charged for each hour, or portion thereof, taken off from the work shift.

8. Employees shall be subject to these sick leave provisions for all assigned shifts Monday through Saturday regardless of whether an Employee was drafted or volunteered to work such assigned shift.

9. With the exception of Employees using intermittent leave under the Family Medical Leave Act, Employees will be charged sick leave for the first day of any absence. Employees may use unpaid leave during periods of excused sickness.

## ARTICLE XXXIII – VACATION LEAVE

1. All Employees covered by this Contract and eligible for vacation leave with pay shall be entitled to the use of vacation leave as provided herein.

4

> (a)     One (1) vacation day for each two (2) month period of service for
>         Employees with less than one (1) year of service.
>
> (b)     Fifteen (15) vacation days for Employees with one (1) through the
>         end of the fourth (4) year of service.
>
> (c)     Twenty (20) vacation days for the Employees with five (5) through
>         the end of the eleventh (11) year of service.
>
> (d)     Twenty-five (25) vacation days for Employees with twelve (12) or
>         more years of service.

Vacation scheduling conflicts among Employees who have provided forty-five
(45) days notice shall be resolved within the station on the basis of bargaining
unit seniority.  Employees requesting vacation shall be required to provide notice
as follows:

> (i)     six (6) or more vacation days..................fifteen (15) days notice
> (ii)    three (3) to five (5) days   ..........................ten (10) days notice
> (iii)   one (1) to two (2) days   ...................twenty-four (24) hours notice

The Employer reserves the right to deny such request based upon business
demands, but such request shall not be unreasonably denied.  Such vacation
shall be granted on a first-come, first-serve basis, based upon the date of
submission.

### Subject:  Employee Personal Conduct

1.0   PURPOSE:
> 1.1    To define the Parsons New Jersey Motor Vehicle Inspection
>        Systems (NJMVIS) policy of acceptable conduct in the workplace.

2.0   APPLICATION:
> 2.1    This policy applies to all Parsons NJMVIS employees.

4.0   POLICY:
> 4.1    Employees are required to behave in a professional manner that
>        ensures a positive, safe and efficient work environment.  Failure to
>        do so may result in disciplinary action, up to and including
>        termination of employment.
>
> 4.2    MAJOR OFFENSES are those so serious in nature that a single
>        offense may justify taking immediate and formal corrective action
>        without prior formal warning, including termination of employment.
>        Any suspected major offense may require suspension of an
>        employee pending an investigation and review of the situation and

5

*discharge may be appropriate upon the first or a single offense.
Discharge is normally enacted in cases of major offenses or where
previous efforts to bring about correction have failed.  The following
are examples of some offenses considered to be a Major Offense.*

*4.2.1  Sexual harassment*

*4.2.3  Immoral, indecent or disorderly conduct including actions
that interfere with the work of other employees, clients or
vendors, which restricts production or disrupts the work
environment.*

*4.2.4  Insubordinate conduct*

**SUMMARY OF FACTS**

The Employer is an international entity involved in construction, energy,

transportation and motor vehicle inspections and employs 25,000 to 30,000

employees world-wide.  Since 1998, the Employer has had a contract with the

State of New Jersey to operate 28 motor vehicle inspection stations.  There are

approximately 500 people in the bargaining unit.  The record reflects that if the

inspection lines are long and there is a delay in having inspections completed,

the State of New Jersey notifies Parsons, and Parsons is subject to a fine by the

State of New Jersey.

On February 6, 2008, Ms. Ancheta, Mr. Ancheta, Mr. Carney and Karolyne

Pratts called off sick from the Mays Landing, New Jersey Inspection Station.

As evidenced by Exh. E-2, there are four inspection teams and Teams 1,

2 and 4 are composed of four employees and Team 3 is composed of 5

employees.

The Inspection Station opens at 7:00 a.m. and closes at 4:00 p.m., with

the exception of Tuesday when the Station is open from 7:00 a.m. to 7:30 p.m.

6

The Station is open that late to accommodate those residents who, because of their work or personal schedule, cannot get there before 4:30.

On February 7, 2008 Gregg Natosi, Regional Manager, sent individual letters to Ms. Ancheta, Mr. Ancheta and Mr. Carney indicating that,

> "Effective immediately, you are placed on an Unpaid Investigatory Leave of Absence up to February 14, 2008. This will enable Parsons to investigate the allegations of your improper conduct."

> "This action is necessitated due to the serious nature of the allegations which, if established that you were at fault, will result in appropriate corrective action being taken up to and including termination of employment. Should the investigation show no misconduct occurred, you will be returned to a paid status and may receive pay for the days you lost."

On February 7 the three named grievants were required to submit an employee statement to Sonyae Turner, the Director of Human Resources. The three grievants and Ms. Pratts complied with their statements as evidenced by Exhs. E-6 to E-9. They all denied that they participated in the work stoppage, created the work stoppage or organized the work stoppage. Ms. Ancheta indicated that she called out on February 6 for personal reasons but she knew that there were two scheduled vacations so as she had been informed that she could not use personal time off so she used a sick day. Mr. Ancheta indicated that he had called out sick because he had diarrhea that day. Ms. Pratts indicated that she was not involved with any conspiracy to create a work stoppage, and on that particular day she needed the day off to take a medical examination as part of the employment interview for the Egg Harbor Township Police Department. Accompanying her statement was a letter from Dr. Nik Parikh indicating that she was there for an office visit.

7

Mr. Carney indicated that he had nothing to do with the work stoppage and that he needed the day off because he had to be with his attorney to have his juvenile record expunged. Mr. Carney further indicated that his appointment with his attorney was at 2:30 in the afternoon of February 6th, as evidenced by Exh. U-8, but he was obligated to go to Atlantic City Probation Department located at the Atlantic City Municipal Court to get copies of his juvenile record so he could bring it to his attorney for his attorney to file the necessary paperwork to have his juvenile record expunged.

On February 8, 2008, Ms. Ancheta, Mr. Ancheta and Mr. Carney received letters from Mr. Natosi. In that letter Mr. Natosi indicated that the initial investigation was completed and that the grievants could return to work on February 11, 2008. However, the Company received information directly related to the investigation and made a determination that the grievants would not go back to work and would be put back on an Unpaid Investigatory Leave of Absence up to February 15, 2008, to enable the Employer to continue the investigation.

On February 15, 2008, the three named grievants received termination letters from Mr. Natosi. The letter indicated that based on the information obtained during the continuing investigation, it had been determined that the grievants participated in a work stoppage by uniting with co-workers and calling out sick on February 6, 2008. This is considered as improper conduct and is a major violation of the SOP 40.4.1. Mr. Carney was also charged with displaying

8

lewd conduct in the parking lot after being placed on the leave of absence on February 8, 2008.

As a result of the investigation, Ms. Pratts was removed as one of the conspirators in the conspiracy to create a work stoppage and shut down the inspection lanes at the Mays Landing Inspection Station.

Exhibits E-4 and E-5 are text messages sent from Mr. Ancheta to co-worker Eliseo Villalongo. Mr. Ancheta testified that it is not unusual for an employee to text to a co-worker that they are not going to be at work the following day.

On February 8, 2008, Todd Whitten, a co-worker and a member of Team 3, submitted an employee statement to Ms. Turner in which he indicated that he told Warren Dunlap, the Manager for the Inspection Station, that he had been informed by Mr. Ancheta that two employees would be out from Team 3 on February 6, 2008.

Mr. Whitten indicated that,

*"This left me and another employee the only two for late night. This was an upset for everyone working that day because those not scheduled to work late shift stayed to help. That is not fair for those employees. I strongly fear that when those involved return to work it will become a hostile work environment. I would be afraid to work with any of them in fear of a setup on a fraudulent inspection to jeopardize my job. These people never made a happy work environment."*

He further indicated that when they returned to work on February the 7th, he was in the break room which has large windows, and he observed the grievants in the parking lot and heard them screaming and saw Mr. Carney grab his crotch and give two middle finger gestures.

9

Employee David Duffy completed an employee statement on February 8, 2008, which was introduced into evidence as Exh. U-4.   Mr. Duffy did not testify. In his statement he indicated,

*"My fellow co-workers and myself feel that the four employees who conspired to call out on Wednesday late night so they could stick it to their co-workers and Parsons are always trying to get someone fired or in trouble.  They bring a bad attitude to work with them and make an unsafe and hostile work environment.  Most of us, including management, feel we always have to look over our shoulders and hope we are not being set up."*

Scott Gandy submitted a statement to Ms. Turner in which he indicated,

*"I, Scott Gandy, on behalf of the rest of the employees here, fear for our jobs. If the four employees come back to our station, none of us feel that we can trust to put our job on the line.  There will be no trust when inspections are performed.  We have had problems in the past with some of the same employees and that is why the employees do not wish to work with them.  When they are at work the attitude that they bring with them brings down all the other employees and that makes for a stressful atmosphere.  When the four employees called out that day it made the rest of us have to work harder and try to keep the wait time down.  I have to thank all of the employees that were there and that they did a great job."*

The Employer's investigation which was conducted on February 13, 2008, by Ms. Turner was introduced into evidence as Exh. U-2.

The Employer introduced Exhs. E-12, 13 and 14 which were harassment workshops that all employees were required to attend.  Those Exhibits were the sign-in sheets for the attendees, and the three named grievants attended those workshops.

These are the essential, uncontroverted facts in the matter at bar and the issue now comes to me for resolution.

## POSITIONS OF THE PARTIES

### For the Employer

The Employer argues that the integrity of its contract with the State of New Jersey to provide credible, unsurpassed service to the residents with motor vehicle inspections is at risk based on the action of Ms. Ancheta, Mr. Ancheta and Mr. Carney.

On February 6, 2008, the three named individuals called out sick, and the events that transpired, including the investigation conducted by Ms. Turner, clearly and unequivocally establish that a work stoppage had occurred.  The evidence in the record conclusively establishes that Mr. Carney committed a lewd act on February 7, 2008, after being placed on a leave of absence.

The Employer relies upon Mr. Whitten's statement introduced as Exh. E-1 which establishes that he was told that there was going to be a work stoppage and that annoyed him because of the impact it would have upon the other employees.

The Employer contends that the testimony of Mr. Whitten and Mr. Iannello, as well as the written statements from Mr. Gandy and Mr. Duffy, establish that those individuals were committed, dedicated employees putting in time above and beyond what they were normally required to do to keep the Inspection Station at the proper level, while the three named grievants continually put road blocks in the path of a smooth running operation.

The Employer argues that the testimony from Ms. Pratts, Mr. Carney and Ms. Ancheta is beyond belief in which they contend that there was a hostile work

11

environment.  The Employer contends that the three "harassment in the workplace" workshops they conducted establish the grievants were at those workshops.  The Employer continued to argue that they have a well-established program for individuals who believe they are subject to harassment and/or are victims of a hostile work environment.  Any employee can call either Ms. Turner or an 800 number to report the incident and get assistance from the Employer. The record reflects that none of the individuals ever called the 800 number or brought the information to Ms. Turner's attention.

While Ms. Pratts contends that she informed Mr. Dunlap of the circumstances about a particular incident, there was no proof offered beyond her bold assertion that she was a victim of a hostile work environment.

The Employer argues that Mr. Iannello and Mr. Whitten, while in the break room, saw through the windows and observed Mr. Carney grab his genitals, which the Employer insists is a lewd conduct prohibited by Section 4.2.3 of Employee Personal Conduct.

Additionally, the Employer argues that the testimony of the three named grievants established that they were attempting to confuse the Arbitrator by drawing a diagram and showing where they were standing when actually Mr. Carney's lewd conduct was right outside the break room and not by the smoking area or the place that is typically called the "smoking hill."

Moreover, the text messages from Mr. Ancheta, introduced as Exhs. E-4 and E-5, establish that he was involved with creating the work stoppage. The testimony of Mr. Whitten and Mr. Iannello, plus the written statements of Mr.

12

Duffy and Mr. Gandy establish that the three named grievants, as well as Ms. Pratts, went out of their way to create a poor working environment. Mr. Whitten and Mr. Iannello both indicated that it would be very difficult if the three named grievants were returned to work because the three grievants and Ms. Pratts would go out of their way to create an unfortunate situation in the inspection lanes.

Mr. Whitten testified that Ms. Pratts on one occasion deliberately walked in front of a car that was being examined by a former co-worker and as a result of that she was hit by the car. He did not indicate whether or not she was out of work for a long period of time, but nevertheless he testified that she deliberately and willfully walked in front of that car to create havoc and confusion and to stop the line.

The Employer contends that they cannot operate with employees who resort to self-help and believe it is appropriate to shut the inspection line down, which then impacts upon residents waiting to have their vehicles inspected. The net effect of that is that the State of New Jersey will fine Parsons for every day that the inspection lines are down or for an inordinate delay in getting cars through the inspection lines.

The Employer contends that the actions of the three named grievants clearly and unequivocally establishes that termination was not only justified but warranted. Additionally, each charge against Mr. Carney on its own merit warrants termination.

13

Accordingly, the Employer asks that the grievance be denied and Ms. Ancheta, Mr. Ancheta and Mr. Carney be terminated from employment.

**For the Union**

The Union argues that the Employer has been operating the Inspection Stations for a nine to ten year period and that the greivants' seniority of seven to eight years clearly establishes that they are veteran employees.

If there was a work stoppage, the Union argues that it was poorly planned. A work stoppage is a concerted activity or a conspiracy to hurt the employer and it inures to employees.

In the instant matter, there is no benefit to the employees. More importantly, employees have days off so the individual grievants could have taken the day off without any trouble. In fact, employees do constantly take sick days or personal days.

The Union concedes that at best the matter against the three named grievants is a violation of the sick leave policy and they should possibly receive a written warning, but they should not be terminated because there was no proof offered that they were involved in a concerted activity to create a work stoppage.

The Union argues that Ms. Pratts was originally part of this conspiracy theory set forth by the Employer, but after an investigation was conducte, they determined that she was at a doctor's office having a physical examination as part of her application to be a member of the Egg Harbor Township Police Department.

14

Mr. Carney spent the entire day traveling through Atlantic County to get copies of his juvenile record and then bring it to his attorney the afternoon of February 7, 2008.  That leaves two people, the Anchetas, to create a work stoppage.

The testimony in the record established that sick days are normally used in lieu of a personal day.  Ms. Ancheta testified that she knew she could not get a personal day because two people were already out that day so she took a sick day.  She testified that she was not feeling well.  She was not asked to produce a doctor's note, and the Employer had no basis to accuse her of being involved in a conspiracy to create a work stoppage.

The Union contends that the Employer's entire case rests upon statements from Mr. Whitten and Mr. Iannello, Mr. Gandy and Mr. Duffy, but there was no proof offered to support the comments those individuals made.  Mr. Gandy and Mr. Duffy did not testify and the Arbitrator allowed the statements to come into the record.  Nevertheless, there was no proof offered that what they wrote on their employee's statements was accurate.

The Union contends that Ms. Pratts testified that some of Mr. Todd's comments were rude, crude and vulgar, and she reported them to Mr. Dunlap.  She is not aware if any action was taken by Mr. Dunlap.  Mr. Carney, an African-American, testified that Mr. Todd told him that he does not like black people or he black women, and Mr. Carney reported that to Mr. Dunlap.  Again, the Union is not aware of any action that was taken by Mr. Dunlap about those comments.

15

The Union argues that the matter before the arbitrator, with the original people named: Ms. Pratts, Ms. Ancheta, Mr. Ancheta and Mr. Carney, have a claim against the Company for creating a hostile work environment.  Ms. Pratts and Ms. Ancheta have a romantic relationship.  Mr. Ancheta is a white Asian-American, and Mr. Carney is an African-American.  The Union contends when that is put into the mix of the situation before the Arbitrator, it becomes obvious that certain individuals were deliberately and willfully creating problems with the four individuals and ultimately the three named grievants.

The Union contends that if Mr. Ancheta were involved in a work stoppage why did he give a copy of the text messages to Mr. Natosi and Mr. Joe Fells, the Union Executive Committee member?  He could have simply destroyed them and said he didn't have them.  He did not do that.  The Union contends that is a clear example of an individual who did not create any work stoppage and was not afraid to present the information he had in his possession to the Employer.

The Union further argues that is hardly the action of someone who wants to hide something.

Ms. Pratts, Ms. Ancheta and Mr. Ancheta all testified that they did not see Mr. Carney grab his genitals and/or flip the middle finger toward the building. The Union argues that Mr. Whitten and Mr. Iannello were in the break room but they could not have seen outside.  Mr. Ancheta and Mr. Carney testified that the windows are actually like a mirror so if you are standing outside looking into the window you cannot see anything.  They are not aware of what you can see

16

looking out, but they did not do anything wrong so they can't understand why Mr. Whitten and Mr. Iannello were making those statements about them.

The Union argues that the windows are tinted so as previously discussed it would be very difficult to see through. However, the Union raises an enhanced argument of its first position. If Mr. Carney did commit a lewd act, who was offended? Nobody from the public was there; nobody from the Motor Vehicle offices were there; there were no complaints from the public and/or the Motor Vehicle office so who was offended? The Union indicates the answer is no one because it never occurred.

The Union argues that the uncontradicted testimony of Ms. Ancheta, Ms. Pratts and Mr. Carney establish beyond reproach that the action of the individuals making bold assertions against them is punitive in nature, and those individuals are trying to hurt and damage the careers of the three named grievants.

The Union argues that the worst case scenario before the Arbitrator is that the grievants receive a written warning for abuse of sick leave. However, since there was no proof that there was any lewd conduct and no proof that there was a violation of any type of work stoppage, the Union asks that the grievance be sustained and the three named grievants be sent back to work with full back pay, benefits and other emoluments as guaranteed by the Agreement.

## DISCUSSION AND OPINION

The unique facts of each case can and do control how a particular disputed action by an employer might be adjudicated if a claim is submitted to

17

arbitration.  Under any set of facts, however, I am limited to and must draw any conclusions from the exhibits presented and testimony given at the arbitration hearing.

The matter at bar is extremely fact sensitive and, as such, can only be decided based upon the facts submitted.  The language of the Agreement, the testimony at the hearing, as well as the documents submitted into evidence, will determine if a prima facie case has been established for either party.

Termination is considered the highest form of economic capital punishment an employer can impose upon employees because the employee's job reputation and economic well-being are at stake.  The conduct the grievants are charged with is a formidable problem in the workplace and one that must be addressed very seriously because of the severe impact it has on productivity, safety, morale and the efficient operation of the Employer's business.

An employer's right to discipline an employee is an inherent condition of employment subject to restrictions in definition and enforcement that have been bargained into a collective bargaining agreement.

The Employer has the burden of proof in the instant matter.  In every disciplinary case there are really two areas of proof: (1) proof of wrongdoing and (2) whether the penalty imposed should be sustained, modified or set aside.  It is not for me to substitute my judgment for that of the Employer.  Rather, it is for me to determine whether the Employer breached its discretionary authority and set forth an extreme penalty not supported by the facts in evidence.

18

The Employer has a high degree of comfort in arguing that Ms. Pratts, as well as the three named grievants, participated in a conspiracy to create a work stoppage.  However, after reviewing the facts in evidence, that high degree of comfort level has a short life expectancy.

Exhibit E-2 shows that Ms. Ancheta, Ms. Pratts and Mr. Carney were on Team 4 while Mr. Ancheta was on Team 3.  Most importantly, Mr. Carney had a legitimate reason to be away from work on that particular day because he was meeting with his attorney to have his juvenile record expunged.  That is not something he wanted the Employer to know about, but nevertheless he put forth the information to show what he had done.  He had to go to two municipalities to get the information he needed to give to his attorney.  He was not at work that day because he had a legitimate reason to be out of work.

Similarly, Ms. Pratts testified, uncontradicted, that she had a physical exam for that day as part of her application to become a member of the Egg Harbor Township Police Department.

The Employer did not have any evidence or any proof that Ms. Pratts deliberately and willfully established February 6, 2008, as the day she went for the examination.  At the same time, the Employer could not prove that Mr. Carney went to meet with his attorney on that day so that the two of them with the two Anchetas being out from work would have created a work stoppage.

I am not convinced that a work stoppage occurred.  Also, I am not convinced that there was a conspiracy to create a work stoppage.  What I am convinced had occurred is an "I said/he said/she said" situation amongst

19

employees.  Mr. Whitten testified that, *"I strongly fear that when those involved return to work it will become a hostile work environment.  I will be afraid to work with any of them for fear of a setup."*  Mr. Whitten cannot be serious with that statement.  He was one of the biggest people in the room so the word fear as attached to Ms. Pratts and the three named grievants just does not go together.  I don't know why Mr. Whitten said what he said, but it does not make any sense to me.

Mr. Iannello testified that he was sitting in the break room when he saw the three named grievants and Ms. Pratts walk by.  He testified that Ms. Pratts was yelling.  Yet, his statement to Ms. Turner is that he heard Ms. Pratts screaming saying, "F" this "F" that... she was screaming at them facing the building and I heard "F" everything and "F" every other word.  He never testified to that at the hearing.  He never testified that the "F" word was used by Ms. Pratts.  He testified that he saw Mr. Carney grab his genitals.  Mr. Whitten said the same thing.

The testimony in the record clearly establishes that where the individuals were standing, and in particular Mr. Carney, it would have been impossible for anybody sitting in that break room to see Mr. Carney.  Mr. Carney testified that he left the building and walked directly to his car in the parking lot.  He did not walk anywhere near where Mr. Whitten and/or Mr. Iannello would have observed him grabbing his genitals and flipping the middle finger at the building.

Mr. Carney testified that he has had verbal disagreements in the past with Mr. Todd and reported that to Mr. Dunlap but nothing was ever done about it.

20

However, he did indicate that Mr. Whitten did tell him that he does not like black people and does not like black women and when that was reported to Mr. Dunlap, no action was taken.

Ms. Pratts testified that she heard indecent comments, racial comments, sexual comments and indecent exposure by Mr. Whitten and reported it to Mr. Dunlap, but no action was taken.

When Ms. Pratts and Mr. Carney testified about the hostile work environment that they observed, an environment full of racial and homophobic comments, I would have expected rigorous cross-examination. There was no cross-examination of that at all. Therefore, the testimony from Ms. Pratts and Mr. Carney is uncontradicted. It is in the record. It is the only thing I can look at to determine whether or not there a basis for why Mr. Whitten would have said what he said about Mr. Carney. Mr. Carney further testified that the prior incident with Mr. Whitten that had been referred to Mr. Dunlap is an example of Mr. Whitten lying. Mr. Carney also said that in the instant matter Mr. Whitten is lying again.

There is nothing in the record to challenge Mr. Carney's position. There was no cross-examination. There was nothing presented that would have shown that what Mr. Carney was accused of, he actually did.

Ms. Pratts also testified that she heard Mr. Whitten and Chris Floyd talking about Chris wanting a cheese steak for lunch. Mr. Whitten said you *"can spread some cheese between my ass and you can then eat it out."* There were customers present. Ms. Pratts reported that to Mr. Dunlap, and he said that he would talk to both of them. She also testified that she has not idea if Mr. Dunlop

21

did in fact talk those employees.  However, what is most important is that statement was in the record and again there was no cross-examination, again there was no rebuttal testimony.  What I have in the record is a clearly shows that a hostile work environment does in fact exist in the Mays Landing Inspection Station.

In support of the position advanced by the Union, Ms. Pratts testified that at one point in time Mr. Gandy, Mr. Howard, Mr. Iannello and Mr. Duffy were on vacation.  Even though they are not on the same team, nevertheless they were all out at the same time.  While that does not appear to be a major issue to the Employer, to the Arbitrator it is a significant issue.  The Employer cannot sustain its argument that because four people were out on a particular day, it is a work stoppage.  Even though vacations are planned, it still has an impact upon the operations of the facility.  Therefore, the February 6, 2008, situation had an impact upon the facility but there was no proof offered that it was a work stoppage.  There was no proof offered that it was a conspiracy on the part of Ms. Pratts and the three named grievants.  At best, what we do have, as is previously indicated, is a bad relationship between employees.

If this was such a searing matter that the Employer determined there was a conspiracy to create a work stoppage and the three named grievants must be terminated, why then did the Employer not invoke Article XII, Section A and require the Union to publicly disavow in writing the action of the three named grievants?  The record is devoid of any action by the Employer to compel the Union to adhere to what the contract language indicates the Employer may

22

request the Union to do.  Even though it says may request, on a matter of such

an intense nature, the Employer definitely and unequivocally should have asked

the Union to adhere to the provision in the contract that the parties bargained.

The Employer chose not to do so.  I have no idea why the Employer did not do

that.  Nevertheless, the fact that they did not do it is to their detriment.

   The testimonies of Mr. Whitten and Mr. Iannello were nothing more than

minuets of defensive exuberances.  To advance the arguments they were

presenting and expecting the Arbitrator to accept them expands the boundaries

of believability to beyond any recognizable limit.  The continued vitality of the

innocence of the three named grievants continues throughout this entire case.

The Employer had no basis for taking the action that it did.  The Employer had

every right to conduct an investigation because four employees were absent on

the same day.  However, does the Employer do that every single time three or

four employees are absent on the same day?  There is no proof that they have

done that.  In the matter at bar, the Employer said, based upon information from

Mr. Whitten, that they knew that the employees were going to be out so there

was a conspiracy.  Unfortunately, the Employer never proved that (a) there was a

conspiracy or (b) that any of the named grievants told Mr. Whitten what they

were going to be doing.

   The inability to raise the Employer's comfort level, an amorphous concept

at best cannot be considered an issue that the Employer can use to discharge an

employee.  Of course, the Employer was uncomfortable. Management and

supervisory employees testified that the State of New Jersey might have asked

23

why the inspection lines were down the Employer faced the possibility of being fined by the State of New Jersey. I can understand the angst of the Employer in wanting to get out from underneath this situation. It may very well be that the Employer did this to show the State that they were taking action against the three named grievants. However, submitting information in response to any kind of query from the State of New Jersey in relationship to a particular incident does not grant credence or support to the Employer's position unless there was sufficient evidence in the record to sustain that position.

I have determined that there was not sufficient evidence in the record to sustain the discharges.

For the foregoing reasons and having duly heard the proofs and allegations of the parties, I Award the following:

## AWARD

The grievance is sustained.  Ann Ancheta, Jonathan Ancheta and Ornell Carney did not participate and/or create a work stoppage on February 6, 2008, at the Mays Landing Inspection Station.  The three named grievants shall be returned to work with full back pay, seniority, and the Employer shall be responsible for the payment of any medical expenses from the date they were terminated to the day of this Arbitration Award.

I shall retain jurisdiction until I am notified that the employees are back to work with all of the emoluments this Award guarantees them.


Dated:        November 20, 2008

Gerard G. Restaino, Arbitrator


State of Pennsylvania)

County of Wayne)   ss:

On this 20th day of November, 2008, before me personally came and appeared GERARD G. RESTAINO to me known to be the person who executed the foregoing document and he duly acknowledged to me that he executed the same.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Judith K. Restaino, Notary Public
Lake Twp., Wayne County
My Commission Expires Nov. 10, 2009
Member, Pennsylvania Association of Notaries

25